IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

| | |
|---|---|
| PHILLIP WADE GRIMES, Personal Representative of the Estate of O.P.G., deceased,<br><br>    Plaintiff,<br><br>v.<br><br>YOUNG LIFE, INC.; INNER QUEST, INC.; and ADVENTURE EXPERIENCES, INC.<br><br>    Defendants. | Case No. 8:16-cv-01410-HMH |

**YOUNG LIFE'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AS TO INNER QUEST'S CROSSCLAIMS FOR INDEMNITY**

# INTRODUCTION

The contract between Inner Quest and Young Life is predominantly one for design, construction, and other consulting services. Inner Quest is thus wrong when it asserts that the UCC's choice of law provision applies. Even, however, if that choice of law provision applies, it does not displace common law governing matters outside the scope of the UCC. The UCC does not address the validity of contractual indemnity provisions. Thus, the UCC does not displace the common law choice of law rule of lex loci contractu, which governs issues of contract validity. North Carolina law therefore controls the issue of whether the indemnity provision is valid, and, pursuant to North Carolina statute, the provision is void and unenforceable.

Even if South Carolina law applies, however, an indemnification clause must clearly and unequivocally state that the indemnitee is to be indemnified against its own negligence, and the language must be construed strictly against the party seeking indemnity and the party who drafted the contract. Broad language providing indemnification against all claims, such as exists here, will not suffice. Applying these rules, the South Carolina courts have found indemnity provisions that are materially indistinguishable from the one at issue insufficient to indemnify the indemnitee against its own negligence. The result should be the same here.

Finally, as regards Inner Quest's claim for equitable indemnity, Inner Quest has failed to demonstrate how the contract at issue establishes the special relationship necessary to support such a claim. No such special relationship exists because Young Life's alleged negligence was not directed at Inner Quest.

# FACTUAL BACKGROUND

Young Life incorporates by reference the statement of facts contained in its opening brief (ECF No. 100-1) and provides the Court the additional facts set out below to meet Inner Quest's newly asserted arguments.

1

The nature of Inner Quest's business is that of a service provider, not a seller of goods. Inner Quest is a corporation organized into two distinct divisions. The first division "is responsible for design, installation, training, inspection services vended to owners and operators of challenge courses." Deposition of Randy Smith, pp. 146–47, attached as Ex. 1. The second division "operate[s] adventure-based challenge course and other adventure-based programming… on contract for schools and other businesses." *Id.* at 147–48. In short, this second division provides challenge course experiences to participants who come to Inner Quest's challenge course. *Id.*

Inner Quest is so involved in the construction of challenge courses that it holds a Virginia Class B contractor's license, a fact that Inner Quest touted in its contract with Young Life. *See* ECF No. 102-2, at 4. As the holder of a Class B license, Inner Quest can perform construction projects as great as $120,000 in value. Va. Code § 54.1-1100.

Inner Quest promised in the contract that all course construction would meet or exceed the standards set by the Association for Challenge Course Technology ("ACCT"). ECF No. 102-2, at 7. The fact that Inner Quest promised to construct the Freebird in accordance with ACCT standards was critically important to Young Life's decision to hire Inner Quest, since Young Life's Brian Johnson considered ACCT certification to be "the litmus test" for identifying companies that were true experts in the challenge course field. Deposition of Brian Johnson, p. 38, attached as Ex. 2; Declaration of Brian Johnson, ¶ 4, attached as Ex. 3.

The contract expressly stated that it was for a construction "project," not the sale of a good. ECF No. 102-2, at 3. "The project covered by th[e] contract" involved Inner Quest installing a 3-person Giant Swing constructed of certain materials Inner Quest obtained from other suppliers and certain materials provided by Young Life. *Id.* Inner Quest was to supply various bolts, washers, steel cables, and cable clamping devices that it obtained from third parties. ECF No. 102-2, at 7.

Inner Quest was also to obtain utility poles from a third party supplier and a winch from Thern, Inc., which Thern shipped directly to Carolina Point. ECF No. 100-5, at 5; Johnson Dec., ¶ 3.

The contract did not have a fixed priced, merely an "Estimated Total" of $36,650. ECF No. 102-2, at 3. The contract expressly stated that "[n]o guarantee can be made regarding pole installation pricing," and that the cost of the contract would increase if pole installation took longer than 6 hours or if soil conditions caused more installation work than anticipated. ECF No. 102-2, at 4. Moreover, the cost of the contract could vary based on whether Inner Quest could find a less expensive vendor for the utility poles used as support poles. ECF No. 100-5, at 5. The price could also decrease if Young Life performed some of the construction work itself, such as installing the guy anchors and providing the necessary digging equipment. ECF No. 102-2, at 3.

Among the itemized elements of the estimated contract price was $1,500 for a pre-construction site evaluation, identified in the contract as one of Inner Quest's "<u>CONSULTING SERVICES</u>." ECF No. 100-5, at 5; ECF No. 102-2, at 5. Inner Quest also estimated a charge to Young Life of $2,000 for a crane rental. ECF No. 100-5, at 5. The only component parts itemized in the contract were the support poles, which were estimated to cost $11,900 unless a cheaper supplier could be found. The combined cost of the construction and installation work and all the other component parts, such as the steel cables, the Thern winch, the bolts and the cable clamps had an estimated contract price of $21,250. ECF No. 100-5, at 5. The majority of this $21,250 price, however, was to pay for the construction and installation work.[1]

---

[1] Of the $21,250 price for parts and installation, the cost of the component parts could not have exceeded $9,000. *See* Johnson Dec., ¶ 5 (listing component parts). The retail cost of the electric Thern winch (Model No. 4WS3M10, with a 1,000 pound load rating), and its electronic components is approximately $5,000. *See* http://www.gilmorekramer.com/more_info/series_4ws_worm_spur_gear_power_winches/series_4ws_worm_spur_gear_power_winches.shtml. The retail price for 1500 feet of ½" galvanized steel cable is approximately $1,350. *See* http://www.e-rigging.com/half-inch-x-500-foot-iwrc-galvanized-wire-rope. 300 feet of winch cable costs approximately $550. *See* http://www.amsteelblue.com/amsteel-blue-5-16-synthetic-rope-by-the-foot-12-300-lbs/. Many of the other products, such as cable clamps, thimbles and swages retail at

3

As with a typical construction contract, this contract required Young Life to make a contract deposit well before construction began, and then to make "progress payments" upon the delivery of the various swing materials. ECF No. 102-2, at 2. The final balance was to be paid "on completion of the project." *Id.* Accordingly, Inner Quest sent Young Life a final invoice to Young Life's North Carolina office shortly after completing the project. ECF No. 100-5, at 22. The final balance reflected that Inner Quest charged Young Life for its employees' meals over the three-day construction period and for supplying the scaffolding for construction. *Id.* However, the final price was lower than the original $36,650 estimate because Young Life received a $2,600 discount for providing and installing the guy anchors and for directly supplying the equipment necessary for digging the holes for the utility poles. *Id.*

## ARGUMENT

### I. The Contract is Predominantly One for Services and, thus, the UCC Choice of Law Provision Does Not Apply.

When a mixed contract for goods and services is at issue courts must determine whether the UCC should apply. In *Ranger Constr. Co. v. Dixie Floor Co.*, 433 F. Supp. 442, 444 (D.S.C. 1977), this Court adopted the predominant factor test originally described in *Bonebrake v. Cox*, 499 F.2d 951 (8th Cir. 1974). This test asks whether the contract's "predominant factor, [its] thrust, [its] purpose, reasonably stated, is the rendition of service, with goods incidentally involved . . . or is a transaction of sale, with labor incidentally involved . . . ." 499 F.2d at 960. In applying this test, the Fourth Circuit identified three indicia on which courts should focus to determine the nature of the contract: "(1) the language of the contract, (2) the nature of the business of the supplier, and (3) the intrinsic worth of the materials involved." *Coakley & Williams, Inc. v. Shatterproof Glass Corp.*, 706 F.2d 456, 460 (4th Cir. 1983). The three indicia will be discussed in turn.

---

inexpensive per unit prices, and add up to no more than $2,000 total. They can be found here: http://www.uscargocontrol.com/.

<u>The language of the contract:</u>  Courts first look to the contract for terms identifying the parties to the contract and the subject of the contract.  For instance, the words "buyer," "seller," and "terms of sale" typically indicate the parties are primarily contracting for the sale of goods.  *Plantation Shutter Co., Inc. v. Ezell*, 492 S.E.2d 404, 406 (S.C. 1997); *see also Kline Iron & Steel Co. v. Gray Commc'ns Consultants, Inc*., 715 F. Supp. 135, 140 (D.S.C. 1989) (term "buyer" was indicative of contract for sale of goods).  On the other hand, words identifying a party as a "contractor" or "subcontractor" indicate a contract is predominantly for services.  *Ranger Constr.*, 433 F. Supp. at 445; *see also Coakley & Williams*, 706 F.2d at 461.

Here, Young Life and Inner Quest are never referenced, respectively, as a "buyer" or "seller" and the terms "purchase order" or "terms of sale" are absent from the contract.  To the contrary, the contract describes Young Life as Inner Quest's "client." ECF No. 102-2, at 4–5.  The contract also identifies Inner Quest as an entity holding a contractor's license that "will construct the Challenge Course. . . ." *Id.* at 2, 4.  On the next page, the contract describes "<u>[t]he project</u> covered by th[e] contract." *Id.* at 3 (emphasis added).  That project was to involve Inner Quest performing a "pre-construction site visit" and then installing a 3-person Giant Swing constructed of certain materials Inner Quest obtained from other suppliers and certain finished materials provided by Young Life.  *Id.*  The contract details actions that must be taken to obtain applicable permits prior to construction and to provide clear access to the "construction site." *Id.*  Moreover, the contract describes the construction methods Inner Quest will use to assemble the various materials it would obtain from other sources, such as the galvanized aircraft cable, the bolts, washers and cable clamps.  *Id.* at 7.  In addition, the contract described the various "<u>*CONSULTING SERVICES*</u>" that

5

Inner Quest was to provide. *Id.* at 5.[2] This contract language shows the contract was a contract primarily for a construction project.

A contract's pricing structure is also indicative of whether it is a contract predominantly for goods or for services. A "fixed price" or "lump-sum" contract, without any price allocation to a particular service, typically suggests the contract is predominantly one for goods. *Plantation Shutter*, 492 S.E.2d at 406; *see also Kline*, 715 F. Supp. at 140 (discussing how "fixed price" for alleged contract is indicative of contract for sale of goods); *Trident Const. Co. v. Austin Co.*, 272 F. Supp. 2d 566, 572 (D.S.C. 2003) (discussing how alleged contract for "lump-sum" price was indicative of contract for sale of goods).

Here, the contract does not speak of a "fixed" or "lump-sum" price. Rather, the contract merely lists an "Estimated Total" of $36,650 that was subject to variance based on the costs and duration of installation, Inner Quest's ability to find a less expensive source for the support poles, and whether Young Life provided certain tools or performed some of the construction work itself. ECF No. 102-2, at. 3; ECF No. 100-5, at 5. Moreover, the contract required Young Life to make a contract deposit, to make "progress payment[s]" and to pay a final balance "on completion of the project." This pricing structure evidences a contract for construction services, and not for the sale of goods. ECF No. 102-2, at 2.

<u>The nature of the business of the supplier:</u> When looking to the nature of the business of the supplier, courts attempt to determine if the supplier typically performs services or supplies goods. *Ranger*, 433 F. Supp. at 445 (noting that the defendant was essentially a service corporation). Inner Quest operates two divisions: one that performs "design, installation, training, inspection services

---

[2] The pre-construction site visit was not the only consulting service Inner Quest provided. The emails between Brian Johnson and Randy Smith describing the location of the swing, the direction it faced, the various component parts, and specialized equipment necessary for the installation of the swing demonstrate that Inner Quest provided other consulting services over the course of the project. Inner Quest's Production of Documents, at 503-IQ-000060-98, attached as Ex. 4.

vended to owners and operators of challenge courses," and one that operates a challenge course for the enjoyment of patrons. Smith Dep. at 146–48. Indeed, Inner Quest made clear in the contract that because it "is always very busy building courses and conducting training" "[n]o construction can be scheduled without a contract and jobs are added to [Inner Quest's] schedule, in order, at the time of receipt of the <u>signed</u> contact." ECF No. 102-2, at 5 (emphasis in original). By Inner Quest's own admission, the nature of its business is primarily that of a service provider, not a seller of goods. This conclusion is driven home by the fact that Inner Quest's business is so wrapped up in construction that it holds a Virginia Class B contractor's license, enabling it to perform construction contracts valued in excess of $100,000. ECF No. 102-2, at. 4; Va. Code § 54.1-1100.

The "nature of the business" factor also asks whether the supplier is assembling finished materials it purchases from third parties. *Compare Ranger Constr.*, 433 F. Supp. at 445 (noting that defendant planned to buy flooring materials from independent dealer) *with RMS Tech., Inc. v. TDY Indus., Inc.*, 64 F. App'x 853, 856 (4th Cir. 2003) (unpublished) (noting that manufacturer of a military training system was a seller of goods in part because it was "in the business of manufacturing and selling [these] systems using its own materials.").[3] Randy Smith's January 19 email clearly states that Inner Quest obtained the utility poles from a third party supplier, and Brian Johnson's declaration establishes that the manufacturer of the winch, Thern, shipped the winch directly to Carolina Point. ECF No. 100-5, at 5; Johnson Dec., ¶ 3. These were, by far, the most costly materials supplied to the job site. As regards the other parts, such as steel cables, bolts and clamps, Inner Quest unquestionably obtained those finished products from third-party suppliers and did not manufacture them itself. Inner Quest then used those finished products made by others to construct the giant swing at Carolina Point. The second factor of the predominant factor test, thus, confirms that this was a contract for a construction project.

---

[3] All unpublished decisions cited herein are attached as Ex. 5.

<u>The intrinsic worth of the materials involved:</u> Courts will sometimes use the cost or worth of the materials involved to help determine if a service or a good is the predominant focus of the contract. *See, e.g.*, *Kline*, 715 F. Supp. at 140. A significant portion of the contract price clearly was charged for consulting services and construction services. For one, Inner Quest's consulting services cost $1,500 and were clearly delineated in the contract. Secondly, the January 19, 2015 proposal to Brian Johnson clarifies that Inner Quest charged Young Life a combined price of $21,250 for component parts (other than the poles) and installation. ECF No. 100-5, at 5. Based on a simple accounting of the swing's component parts at their retail price, approximately $12,000 of the $21,250 cost for parts and installation was to pay for Inner Quest's construction and installation work. *See supra* n.1. So, for its construction and consulting services, Inner Quest charged Young Life approximately $13,500 (assuming Inner Quest paid full retail for the various component parts). It is, therefore, an untenable stretch for Inner Quest to describe the construction and consulting services it provided under the contact as merely "incidental" to the contract.

In sum, the three indicia outlined in *Coakley & Williams* compel the conclusion that the contract is one primarily for design, construction, installation, and consulting services.[4] Because the contract at issue is predominantly one for services, the UCC and its choice of law provision adopted in S.C. Code § 36-1-301 do not apply to this dispute.

II.  **Even if the Contract is Predominantly for the Sale of Goods, Application of S.C. Code § 36-1-301 Does Not Displace the Common Law Choice of Law Rule for Issues Outside the Scope of the UCC, Including the Issue of Whether the Indemnity Clause is Void and Unenforceable.**

Inner Quest grossly distorts the effect of the UCC's choice of law provision, S.C. Code § 36-1-301(b), and falsely claims that it mandates application of <u>all</u> South Carolina substantive law,

---

[4] Although Inner Quest is quick to point out the acknowledgement in *Plantation Shutter* that courts have applied the UCC in most cases of mixed contracts, this assertion lacks any analytical reference to the contract between Young Life and Inner Quest, the nature of Inner Quest's business, or the cost of the materials used to construct the swing. In fact, Inner Quest fails to even address these indicia in its brief. *See* ECF No. 102-1, at 5-6.

8

including a South Carolina statute, S.C. Code § 32-2-10, that exists outside of, and has nothing to do with, the UCC. In true fact, the UCC's choice of law provision merely provides the choice of law rule for deciding which state's commercial code will govern issues within the scope of the code. By its very terms, the provision is expressly limited to that narrow scope. The UCC's choice of law provision simply says that where a contract for the sale of goods fails to specify the governing law, "the [South Carolina] <u>Uniform Commercial Code applies</u>" if the transaction bears an appropriate relation to South Carolina. S.C. Code § 36-1-301(b) (emphasis added). Nothing in § 36-1-301(b) directs courts to apply <u>other</u> South Carolina law that exists outside the UCC. Thus, nothing in § 36-1-301(b) directs courts to apply S.C. Code § 32-2-10. Inner Quest's unsupported contention that the UCC somehow directs application of this non-UCC statute must be rejected.

As the South Carolina Supreme Court explained in *Hitachi Electronic Devices (USA), Inc. v. Platinum Technologies, Inc.*, 621 S.E.2d 38, 41 (S.C. 2005), "when one or more particular provisions of the U.C.C. comprehensively addresses a particular subject," the UCC displaces the common law. When, however, the UCC is incomplete, "the common law provide[s] the applicable rules." *Id.* The UCC itself makes that clear. S.C. Code § 36-1-103(b).[5]

Here, the UCC's choice of law provision is incomplete. As stated, it only provides the rule for deciding which state's commercial code applies to issues governed by the code. It speaks not at all to what choice of law rule applies on issues outside of the scope of the code. Because the UCC contains nothing addressing the validity or enforceability of contractual indemnity clauses, the UCC's choice of law provision does not provide the choice of law rule to be applied to the

---

[5] "Unless displaced by the particular provisions of this title [Title 26, the UCC], the principles of law and equity, including the law merchant and the law relative to the capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions." S.C. Code § 36-1-103(b). "The list of sources of supplemental law in subsection (b) is intended to be merely illustrative of the other law that may supplement the Uniform Commercial Code, and is not exclusive. No listing could be exhaustive." S.C. Code § 36-1-103(b), cmt.3.

9

particular issue at hand here, namely, whether the indemnity provision is void or is enforceable. Stated differently, the UCC's choice of law provision does not displace the common law's choice of law rules regarding the validity of the indemnity provision. *Hitachi Elec. Devices*, 621 S.E.2d at 41. Instead, the common law remains undisturbed for that particular choice of law question.

The common law makes clear that "[m]atters bearing upon … the validity of a contract are determined by the law of the place where the contract is made." *Livingston v. Atl. Coast Line R. Co.*, 180 S.E. 343, 345 (S.C. 1935); *Georgia Bank & Trust Co. of Augusta v. Trenery, Jr.*, No. CIV.A. 3:08-2371-JFA, 2010 WL 3271732, at *7 (D.S.C. Aug. 18, 2010) (unpublished). Inner Quest does not dispute, nor could it, that the contract was formed in North Carolina. Because contract formation occurred in North Carolina, North Carolina law governs the validity of the contract's indemnity provision. North Carolina General Statute § 22B-1 unquestionably declares the indemnity provision to be void, unenforceable and against public policy. *See* ECF No. 100-1, at 13-17. The Court, therefore, should grant Young Life's motion for summary judgment.[6]

### III. South Carolina Does Not Adhere to the Restatement's Most Significant Relationship Test.

Inner Quest next argues that even if S.C. Code. § 36-1-301 does not apply, South Carolina law still governs because South Carolina common law applies the most significant relationship test set forth in the Restatement (Second) of Conflicts of Laws. That is incorrect. The rule of lex loci

---

[6] The cases Inner Quest cites when contending that all South Carolina law, not solely that body of South Carolina law contained in the UCC, should be applied say no such thing. In *Myrtle Beach Pipeline Corp. v. Emerson Elec. Co.*, 843 F. Supp. 1027 (D.S.C. 1993), the court applied the UCC's choice of law provision to decide that South Carolina law governed a claim presented squarely under the UCC, namely a claim for breach of implied warranty asserted under S.C. Code. § 36-2-314. 843 F. Supp. 1033. The *Myrtle Beach Pipeline* court, therefore, never had to address whether common law choice of law rules determine the law governing issues not addressed within the four corners of the UCC. Similarly, in *In re Merritt Dredging Co., Inc.*, 839 F.2d 203 (4th Cir. 1988), the issue was whether a charter agreement for a vessel constituted a security agreement under Article 9 of the UCC. 839 F.2d at 210. Thus, just like the *Myrtle Beach Pipeline* court, the *In re Merritt Dredging* court did not speak to whether the UCC's choice of law provision controls the choice of law for issues that the UCC does not address.

10

contractu is South Carolina's governing choice of law rule when it comes to matters of contract validity and performance. *Livingston*, 180 S.E. at 345; *Trenery*, 2010 WL 3271732 at *7. The two cases Inner Quest cites in support of its argument do not address choice of law rules applicable to issues of contract validity. *McDaniel v. McDaniel*, 133 S.E.2d 809, 813 (S.C. 1963), addresses the choice of law provision applicable to a wrongful death action, and *Menezes v. W. Ross & Co., LLC*, 744 S.E.2d 178, 182 n.2 (S.C. 2013), addresses a question under corporate law.[7] Thus, neither case holds that the Restatement (Second)'s most significant relationship test supplants the well-established rule of lex loci contractu in South Carolina when contract validity and performance are at issue.

Lastly, Inner Quest incorrectly cites to *Lister v. NationsBank of Delaware, N.A.,* 494 S.E.2d 449 (SC. App. 1997), for the proposition that South Carolina applies the most significant relationship test. In actuality, the *Lister* court correctly noted that South Carolina has not adopted the modern Restatement (Second) for choice of law rules, including the most significant relationship test. 494 S.E.2d at 456. Instead, *Lister* specifically noted that the rule of lex loci contractu established in *Livingston* applied to the choice of law dispute involving contract performance. *Id.* at 144, 494 S.E.2d at 455.

### IV. Even if South Carolina Law Applies, the Indemnification Provision Does Not Clearly and Unequivocally Indicate that Inner Quest Will Be Indemnified for its Own Negligence as South Carolina Law Requires.

Despite Inner Quest's argument that South Carolina law applies, Inner Quest fails to address the fact that, under South Carolina law, "a contract of indemnity will not be construed to indemnify the indemnitee against losses resulting from its own negligent acts unless such intention is

---

[7] Moreover, *Menezes* indicates that South Carolina generally follows the *traditional* choice of law rules found in the Restatement (First) of Conflict of Laws. *See* 744 S.E.2d 178, 182 n.2. These rules are, of course, different from the *modern* choice of law rules found in the Restatement (Second) of Conflict of Laws. The First Restatement of Conflict of Laws plainly follows the rule of lex loci contractu. *See* Restatement (First) of Conflict of Laws § 332 (1934).

11

expressed in clear and unequivocal terms." *Laurens Emergency Med. Specialists, PA v. M.S. Bailey & Sons Bankers*, 584 S.E.2d 375, 379 (S.C. 2003) (quoting *Fed. Pac. Elec. v. Carolina Prod. Enters.*, 378 S.E.2d 56, 57 (S.C. App. 1989)). Moreover, South Carolina requires "strict construction of a contract containing an indemnity provision purporting to relieve an indemnitee from the consequences of its own negligence." *Laurens*, 584 S.E.2d at 378–79. In addition, all doubt must be resolved in favor of the non-drafting party. *Fed. Pac. Elec.*, 378 S.E.2d at 59 (citing *Murray v. Texas Co.*, 174 S.E. 231, 234 (S.C. 1934)).

The indemnification provision at issue here, which Inner Quest drafted, states that Young Life agrees to indemnify Inner Quest "from *any claim for any loss or injury, including death, however caused*, arising in whole or in part from the authorized or unauthorized use of the [Freebird swing]." ECF No. 102-2, at 3 (emphasis added). This language is not materially different from the indemnification provisions addressed in *Federal Pacific* and *Murray*.[8] The courts in both cases held that, although the indemnity language was broad, it did not sufficiently indicate in a clear and unequivocal manner that the indemnitee would be indemnified against its own negligence. *Fed. Pac.*, 378 S.E.2d at 58–59; *Murray*, 174 S.E. at 232. Because the subject language here is essentially the same as in *Federal Pacific* and *Murray*, the result must be the same.[9]

### V.     South Carolina Public Policy Does Not Require this Court to Disregard N.C. Gen. Stat. § 22B-1.

Inner Quest argues that, even if North Carolina law governs, the Court should ignore N.C. Gen. Stat. § 22B-1 based on South Carolina public policy. The application of public policy is

---

[8] The language in *Federal Pacific* provided for indemnity "against any damage suffered or liability incurred on account of bodily injury to any person or persons… or any loss or damage of any kind in connection with the Leased Premises…." 378 S.E.2d at 57. Similarly, in *Murray*, the language provided for indemnity "from all claims, suits, and liabilities of every character whatsoever and howsoever arising from the existence or use of the equipment…." 174 S.E. at 231–32.

[9] As did the Court of Appeals in *Federal Pacific*, 378 S.E.2d at 59, Young Life acknowledges the outlier decision in *Midland Insurance Company v. Delta Lines, Inc.*, 530 F. Supp. 190 (D.S.C. 1982). For the same reason that the *Federal Pacific* court declined to follow *Midland*, this Court should find that *Midland* does not control this issue.

determined on a case-by-case basis. *Hooters of Am., Inc. v. Phillips*, 39 F. Supp. 2d 582, 615–16 (D.S.C. 1998). Moreover, "public policy is implicated only where it is explicit, well defined and dominant, and ascertainable by reference to the laws and legal precedents and not from the general consideration of supposed public interests." *Id.* (citation and internal quotation omitted). Inner Quest cannot identify any policy requiring the Court to disregard N.C. Gen. Stat. § 22B-1.

Inner Quest first argues that applying the North Carolina statute would offend South Carolina's "public policy favoring parties' freedom to contract." However, South Carolina does not recognize any "explicit, well defined and dominant" policy providing parties with unbridled freedom to contract. To the contrary, longstanding policy and law actually limit the contractual terms that parties may agree upon in South Carolina. *See, e.g.*, *Nationwide Mut. Ins. Co. v. Rhoden*, 728 S.E.2d 477, 480 (S.C. 2012) ("It is axiomatic that freedom of contract is subordinate to public policy . . .") (citation and internal quotation omitted); *Pride v. S. Bell Tel. & Tel. Co.*, 138 S.E.2d 155, 157 (S.C. 1964) (recognizing that if courts find contract provisions against public policy or unconscionable, courts may declare the provisions unenforceable); S.C. Code § 32-2-10 (restricting parties' ability to enter into indemnification agreements). As such, there is no blanket public policy in South Carolina requiring courts to give effect to otherwise unenforceable contractual terms entered into by the contracting parties.

Next, Inner Quest argues that applying N.C. Gen. Stat. § 22B-1 is against South Carolina public policy because it is broader than the similar South Carolina statute located at S.C. Code § 32-2-10. Inner Quest, however, does not offer any support for its assertion that public policy is violated simply by applying a slightly broader statute from another jurisdiction. In fact, South Carolina law holds otherwise. *Dawkins v. State*, 412 S.E.2d 407, 408 (S.C. 1991) ("The fact that the law of two states may differ does not necessarily imply that the law of one state violates the public policy of the other.").

13

Finally, Inner Quest argues that applying N.C. Gen. Stat. § 22B-1 would violate South Carolina public policy because N.C. Gen. Stat. § 22B-1 was enacted solely to protect the owners of real property in North Carolina. The Court should reject this argument out of hand. Inner Quest's sole basis for this argument is a completely different North Carolina statute—N.C. Gen. Stat. § 22B-2—that expressly limits its applicability to improvements to real estate located in North Carolina. There is no such limiting language in N.C. Gen. Stat. § 22B-1.[10]

In conclusion, Inner Quest has failed to show any explicit, well defined and dominant public policy interest, identifiable in South Carolina's laws and legal precedents that would require this Court to abandon the rule of lex loci contractu in order to disregard N.C. Gen. Stat. § 22B-1.

## VI.   No Special Relationship Exists to Support Inner Quest's Claim for Equitable Indemnification.

Inner Quest claims that the contractual relationship between Young Life and Inner Quest is sufficient to establish the requisite special relationship necessary for Inner Quest to seek a valid claim for equitable indemnity against Young Life. Inner Quest cites to *Toomer v. Norfolk S. Ry. Co.*, 544 S.E.2d 634 (S.C. App. 2001), for the proposition that any contractual relationship automatically establishes the right of either party to the contract to bring a claim of equitable indemnification against the other. *Toomer* does not, however, hold as a general matter that contractual relationships are sufficient for equitable indemnification claims to proceed. Furthermore, Inner Quest does not cite to any case that establishes such a rule.

---

[10] Inner Quest further argues that Brian Johnson's execution of the contract in North Carolina was merely a "quirk" in the background of this litigation. What Inner Quest now describes as a quirk was, in reality, intentional and deliberate actions by Inner Quest in seeking to contract with Young Life in North Carolina. Indeed, Inner Quest drafted the contract with Young Life's Brevard, North Carolina address on the first page. ECF No. 102-2, at 2. Inner Quest delivered the contract to Young Life in North Carolina. ECF No. 100-5, at 3, 8. In short, Inner Quest was fully aware of the fact that it was contracting with Young Life at its North Carolina location in Transylvania County, North Carolina.

14

*Toomer* does recognize *Winnsboro v. Wiedman-Singleton, Inc.*, 414 S.E.2d 118, 120–21 (S.C. 1992), which states unequivocally that "[a] sufficient relationship exists when the at-fault party's negligence or breach of contract is directed at the non-faulting party." This rule generally manifests itself in relationships between two parties where one party's negligence flows to the other, such as in a master/servant or contractor/subcontractor relationship. *See* ECF No. 100-1, at 19-21. Inner Quest interprets this "directed at" language as meaning that any time an injured party asserts negligence claims against multiple defendants, a defendant that proves to be free of fault, automatically has an equitable indemnity claim against other at-fault defendants.

Such an overbroad interpretation of the "directed at" language nullifies the well-settled requirement of a special relationship. If such a flawed interpretation were accurate, the *Toomer* court would have reached a different result and reversed the trial court's dismissal of a co-defendant's subject equitable indemnity complaint. Inner Quest simply fails to show any special relationship between Young Life and Inner Quest permitting an equitable indemnity claim.

As a final matter, Inner Quest claims that because there is still a remaining dispute as to each party's respective negligence, Young Life's motion for summary judgment as to Inner Quest's claim for equitable indemnity must be denied. However, this is patently incorrect because no determination of the parties' respective liability is needed to determine whether a sufficient special relationship exists between Young Life and Inner Quest. *See Toomer*, 544 S.E.2d at 637. Thus, this Court should dismiss Inner Quest's crossclaim for equitable indemnity.

## **CONCLUSION**

For the foregoing reasons, Young Life respectfully requests that the Court grant its motion for summary judgment in its entirety.

Respectfully submitted,


<u>/s/ William H. Floyd, III</u>
William H. Floyd, III (Fed. I.D. 1580)
NEXSEN PRUET, LLC
55 E. Camperdown Way, Suite 400
P.O. Box 10648 (29603-0648)
Greenville, SC 29601
Ph: (800) 825-6757
Fax: (803) 253-8277
WFloyd@nexsenpruet.com

-and-

Jack M. Strauch
NC Bar No. 22341
*Admitted Pro Hac Vice*
530 N. Trade Street, Suite 303
Winston-Salem, NC 27101
Ph: (336) 836-1061
Fax: (336) 725-8867
jstrauch@sgandm.com

*Attorneys for Young Life, Inc.*

January 18, 2017
Greenville, South Carolina

16